**FEDERAL TRADE COMMISSION,**
**Plaintiff,**

v.

**THINK ACHIEVEMENT CORP.,**
**et al., Defendants,**

**and**

**Linda Tankersley, Relief Defendant.**

**No. 2:98–CV–12–TS.**

United States District Court,
N.D. Indiana,
Hammond Division.

Sept. 29, 2000.

Gregory A. Ashe, Federal Trade Commission, Washington, DC, for plaintiff.

Gregory J. Sarkisian, Sarkisian and Fleming, Portage, IN, Nick J. Thiros, Cohen and Thiros, Merrillville, IN, for defendants.

## MEMORANDUM OF DECISION AND ORDER

SPRINGMANN, United States Magistrate Judge.

This matter is before the Court on a Motion for Summary Judgment filed by the Plaintiff, the Federal Trade Commission ("Commission"), on June 8, 1999, against the corporate Defendants, Think Achievement Corp., National Service, Inc., The Answering Service, Inc., The Rosewood Group, New Age Advertising Corp., H.D. Davidson Advertising Corp., Career Advancement Corp., and Information Delivery Systems, Inc. (collectively, "Corporate Defendants"), the individual Defendant William H. Tankersley ("Tankersley"), and the Relief Defendant Linda Tankersley. The Defendant, Tankersley, and the Relief Defendant, Linda Tankersley, filed their Response on August 8, 1999. The Plaintiff filed its Reply on

September 20, 1999. For the following reasons and pursuant to Federal Rule of Civil Procedure 56(d), the Plaintiff's Motion for Summary Judgment is GRANTED IN PART.[1]

## STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "[S]ummary judgment is appropriate—in fact, is mandated—where there are no disputed issues of material fact and the movant must prevail as a matter of law. In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir.1994) (citations and quotation marks omitted). Thus, a summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

No genuine issue of material fact exists for trial where the record taken as a whole

---

1. The Court grants the Plaintiff's Motion for Summary Judgment. However, this Memorandum and Order relates only to that portion of the Plaintiff's Motion involving liability.

Because attorneys fees remain at issue, the Court will issue a separate Memorandum and Order on damages, which will also address fees. *See* F.R.C.P. 56(d).

could not lead a rational trier of fact to find for the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Juarez v. Ameritech Mobile Communications, Inc.*, 957 F.2d 317, 322 (7th Cir.1992). Stated positively, a genuine issue for trial only exists where there is sufficient evidence favoring the non-movant for a jury to return a verdict for that party. *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505; *Unterreiner v. Volkswagen of America, Inc.*, 8 F.3d 1206, 1210 (7th Cir.1993). Furthermore, not every factual dispute creates a barrier to summary judgment; instead, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. The inquiry involved in ruling on the motion for summary judgment implicates the substantive evidentiary standard of proof, for example, preponderance of the evidence, that would apply at trial. *Id.* at 252, 254, 106 S.Ct. 2505; *Jean v. Dugan*, 20 F.3d 255, 263 (7th Cir.1994).

A party seeking summary judgment bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. The moving party may discharge its "initial responsibility by simply 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the non-moving party's case." *Id.* at 325, 106 S.Ct. 2548. When the non-moving party would have the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Id.* at 323, 325, 106 S.Ct. 2548; *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 n. 3 (7th Cir.1994); *Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1256 (7th Cir. 1990). However, the moving party may, if it chooses, support its motion for summary judgment with affidavits or other materials and thereby shift to the non-moving party the burden of showing that an issue of material fact exists. *Kaszuk v. Bakery & Confectionery Union & Indus. Intern. Pension Fund*, 791 F.2d 548, 558 (7th Cir. 1986); *Bowers v. DeVito*, 686 F.2d 616, 617 (7th Cir.1982); *Faulkner v. Baldwin Piano & Organ Co.*, 561 F.2d 677, 683 (7th Cir.1977). Under Local Rule 56.1, the moving party must file with the court a "Statement of Material Facts," supported by appropriate citation to the record, as to which the moving party contends there is no genuine issue.

Once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. F.R.C.P. 56(e); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir.1994). Federal Rule of Civil Procedure 56(e) establishes: "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." *See also Anderson*, 477 U.S. at 248–50, 106 S.Ct. 2505. Thus, to demonstrate a genuine issue of fact, the non-moving party must do more than raise some metaphysical doubt as to the material facts; the non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita*, 475 U.S. at 586, 106 S.Ct. 1348; *Juarez*, 957 F.2d at 322. Under Local Rule 56.1, the party opposing the motion shall file any affidavits or other documentary material controverting the movant's position, including a "Statement

of Genuine Issues," supported by appropriate citation to the record, that outlines the material facts that the non-movant contends present genuine issues of fact that must be litigated. *See also Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 922 (7th Cir.1994).

In viewing the facts presented on a motion for summary judgment, the court must construe all facts in the light most favorable to the non-moving party and draw all legitimate inferences and resolve all doubts in favor of that party. *NLFC, Inc. v. Devcom Mid–America, Inc.*, 45 F.3d 231, 234 (7th Cir.1995); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir.1994); *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1440 (7th Cir. 1992). The court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505; *Doe*, 42 F.3d at 443. Furthermore, in determining the motion for summary judgment, the court will assume that the facts as claimed and supported by admissible evidence by the moving party are admitted to exist without controversy, except to the extent that such facts are controverted in the "Statement of Genuine Issues" filed in opposition to the motion. L.R. 56.1

## PROCEDURAL BACKGROUND

The Commission commenced this civil action on January 15, 1998, alleging that the Defendants engaged in deceptive acts or practices in violation of section 5(a) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a), in the course of telemarketing career advisory goods and services.[2] Upon motion by the Commission, this Court issued an *ex parte* Temporary Restraining Order ("TRO") on January 15, 1998, and a second Temporary Restraining Order ("Second TRO") on February 10, 1998, enjoining the Defendants' alleged unlawful practices, freezing the Defendants' assets, appointing a temporary receiver, and ordering the Defendants to show cause why a preliminary injunction should not issue. Preliminary injunctions were entered on February 10, 1998, and March 31, 1998.

On July 8, 1998, all parties consented to have this case assigned to a United States Magistrate Judge to conduct any and all proceedings in the case and order the entry of a final judgment, and the Court issued its Notice of Assignment. Accordingly, this Court has authority to decide the merits of this case under 28 U.S.C. § 636(c)(1).

On October 22, 1998, the Plaintiff filed its Second Amended Complaint for Injunction and Other Equitable Relief. On October 22, 1998, the Defendants filed their Answer to Amended Complaint for Injunction and Other Equitable Relief. On June 8, 1999, the Commission filed its Motion for Summary Judgment against the Corporate Defendants, Tankersley, and Linda Tankersley pursuant to Federal Rule of Civil Procedure 56.[3] On August 2, 1999,

---

2. The Commission's original Complaint, filed on January 15, 1998, named Think Achievement, National Answering Service, New Age Advertising, H.D. Davidson Advertising, Patricia A. Harris, Harry D. Brankle, Sena J. Rager, Tillwanner Jackson, Ferron F. Harris, Steven F. Stucker, and Jill Robinson. The Commission's First Amended Complaint, filed on February 10, 1998, added The Answering Service, The Rosewood Group, Career Ad-

vancement, Information Delivery Systems, William J. Tankersley, and David Barnack as Defendants. The Commission's Second Amended Complaint, filed on October 22, 1998, added Linda Tankersley as a Relief Defendant.

3. The Commission has settled with all other Defendants. On October 22, 1998, this Court entered a Final Order for Permanent Injunc-

Tankersley and Linda Tankersley filed a Response to the Plaintiff's Motion. On September 13, 1999, Tankersley and Linda Tankersley filed a Supplementation of their Response. On September 20, 1999, the Commission filed its Reply. The Corporate Defendants did not file any opposition.

## MATERIAL FACTS

### A. The Parties

The Plaintiff, the Federal Trade Commission, is an independent agency of the United States government created by the Federal Trade Commission Act ("FTC Act"). 15 U.S.C. §§ 41–58. Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes the Commission to initiate, through its own attorneys, court proceedings to enjoin violations of Section 5(a) of the FTC Act in order to secure such equitable relief as may be appropriate in each case.

Defendant Think Achievement is an Indiana corporation that was incorporated in October 1983. SJ Ex. 2 ¶ 5; TRO Ex. 32, Att. A at 1. Defendant National Answering Service is a Nevada corporation that was incorporated in October 1994. SJ Ex. 2 ¶ 6; TRO Ex. 32, Att. D at 5. Defendant New Age Advertising is a Nevada corporation that was incorporated in October 1994. SJ Ex. 2 ¶ 10; SJ Ex. 1 ¶ 10; SJ Ex. 3 ¶ 10; TRO Ex. 32, Att. E at 6. Defendant H.D. Davidson Advertising is a Nevada corporation that was incorporated in October 1996. SJ Ex. 2 ¶ 11; SJ Ex. 9 ¶ 6; TRO Ex. 32, Att. F at 5. Defendant Career Advancement was originally incorporated as an Indiana corporation in 1987. SJ Ex. 35, Att. O at 637; TRO Ex. 32, Att. C. Career Advancement was dissolved in December 1994, TRO Ex. 32, Att. C, and reincorporated in September 1995 as a Florida corporation, TRO Ex. 38, Att. B. Defendant The Rosewood Group is a Nevada corporation that was incorporated in September 1997. TRO Ex. 37, Att. I; SJ Ex. 2 ¶ 8. Defendant The Answering Service is an Indiana corporation that was incorporated in May 1997. TRO Ex. 38, Att. A; SJ Ex. 2 ¶ 7. Defendant Information Delivery Systems is an Indiana corporation that was incorporated in December 1996. SJ Ex. 2 ¶ 13; TRO Ex. 32, Att. B.

The Corporate Defendants all operated out of the same office locations at 701 East 83rd Avenue in Merrillville, Indiana, and 946 South Court Street in Crown Point, Indiana. SJ Ex. 2 ¶¶ 5–8, 13; SJ Ex. 10 ¶ 11; SJ Ex. 11 ¶ 11; SJ Ex. 15 at 178–80; SJ Ex. 17 at 223–25; SJ Ex. 28 at 441; SJ Ex. 13 at 145; TRO Ex. 24 ¶ 7; TRO Ex. 32, Att. AA at 2–4; TRO Ex. 38, ¶ 12–13, Att. F, G. In addition, the Corporate Defendants have operated using various business names and addresses: 3 North Court Street, Suite B–352, Crown Point, Indiana; 2008 West 81st Avenue, Suite 566, Merrillville, Indiana; 1475 Terminal Way, Suite E, Reno, Nevada; "Career Guides" at 2533 North Carson Street, Suite 1917, Carson City, Nevada; "Postal Career Guides" at 3447–N McGehee Road, Suite 225, Montgomery, Alabama; and "Employment Network Center" at 10800 Alpharetta Highway, Suite 200–F, Roswell, Georgia. SJ Ex. 2 ¶¶ 5, 6, 8, 10, 11, 13; TRO Ex. 6, ¶ 4; TRO Ex. 32, ¶¶ 21–22; TRO Ex. 8, ¶ 4; TRO Ex. 31, ¶¶ 11, 13. In addition, money was regularly transferred among the various companies. Receiver's First Inventory at 4; SJ Ex. 10 ¶ 13; SJ Ex. 11 ¶¶ 14,

tion and Settlement of Claims as to Defendant Steven F. Stucker. On June 15, 1999, this Court entered a Final Order for Permanent Injunction and Settlement of Claims as to Defendants Patricia A. Harris, Harry D. Brankle, Sena J. Rager, Tillwanner Jackson, and David L. Barnack. Also on June 15, 1999, this Court entered a Final Order for Permanent Injunction and Settlement of Claims as to Defendants Ferron F. Harris and Jill Robinson.

15, 17; SJ Ex. 35B; SJ Ex. 35E; SJ Ex. 35A.

The elaborate corporate structure utilized by the Defendants' operation resulted from the direction of the individual Defendant Tankersley. SJ Ex. 38 at 50, 52, 56; SJ Ex. 10 ¶ 10; SJ Ex. 11 ¶ 10. The Corporate Defendants were controlled, directed, and operated by Tankersley. . Receiver's First Inventory and Appraisal, filed January 28, 1998, at 4; SJ Ex. 10 ¶¶ 12, 13; SJ Ex. 11 ¶¶ 12, 13, 16; SJ Ex. 35, Att. C; SJ Ex. 38 at 17–18. Tankersley was the president, secretary, treasurer, and director of both the Indiana and Florida incarnations of Career Advancement.[4] SJ Ex. 1 ¶ 21; Opposition to Default Judgment at 4; TRO Ex. 38, Att. B; SJ Ex. 35P ¶ 1. He was also a corporate officer of The Answering Service, The Rosewood Group, and Think Achievement. Opposition to Default Judgment at 4; SJ Ex. 35V; SJ Ex. 22 at 304–05; TRO Ex. 32, Att. X at 1. He has admitted that he was the person in charge of Career Advancement's operations and the person most knowledgeable about its business practices. SJ Ex. 35P ¶¶ 5, 6. Career Advancement's tax returns indicate that Tankersley was its sole owner. SJ Ex. 35S. *See also* SJ Ex. 23 at 313; TRO Ex. 23 ¶ 4. Until 1994, he was also the sole owner of Think Achievement. SJ Ex. 35R; SJ Ex. 35U; SJ Ex. 23 at 312; SJ Ex. 22 at 302.

Originally, the Defendants' operation was conducted through two corporations—Think Achievement and Career Advancement. SJ Ex. 10 ¶ 10; SJ Ex. 11 ¶ 10. In June 1992, the Postal Service filed an administrative complaint against Career Advancement and Tankersley, charging them with making false representations. TRO Ex. 31, Att. J at 1–11. In November of 1992, the parties signed a settlement agreement that provided that Career Advancement and Tankersley would discontinue the alleged false representations and honor past and future refund requests. TRO Ex. 31, Att. J at 23–31. A judicial officer issued a cease and desist order in accord with the settlement agreement. TRO Ex. 31, Att. J at 16–17. In November of 1993, the State of Wisconsin filed a civil complaint against Career Advancement in state court. TRO Ex. 31, Att. K. After the State of Wisconsin charged Career Advancement with falsely advertising the local availability of postal, telephone company, and park ranger jobs, Career Advancement entered into a consent judgment in September of 1994, which included an injunction against misrepresentations, a forfeiture and penalty assessment totaling $20,000, and an order of restitution. TRO Ex. 31, Att. K.

As complaints mounted, Tankersley caused two new corporations to be created in October of 1994, New Age Advertising and National Answering Service, to take over the Defendants' operations. SJ Ex. 10 ¶ 10; TRO Ex. 32, Att. D at 5; TRO Ex. 32, Att. E at 6. Advertisement placement was performed by New Age Advertising, and the telemarketing was performed by National Answering Service. SJ Ex. 10 ¶ 10. In an effort to insulate himself from future law enforcement action, Tankersley, however, did not name himself as a shareholder or officer for these two new companies, but rather named employees. SJ Ex. 10 ¶¶ 10, 12;

---

4. Tankersley has indicated to the Court that the Indiana incarnation of Career Advancement is not a party to this case, but may be a necessary or indispensable party. However, Tankersley has never filed the necessary filings before this Court under Federal Rules of Civil Procedure 12(b)(7) and 19. Furthermore, it is clear that Tankersley owned and controlled Career Advancement and that the Receiver has treated both incarnations of Career Advancement as part of the same scheme.

SJ Ex. 11 ¶ 12. In a meeting on April 3, 1995, Tankersley circulated a directive that "[w]hoever picks up the certified mail at the post office should *not* sign for documents addressed to New Age Advertising or from Better Business Bureaus or Attorney General [sic]." SJ Ex. 35Q at 658. *See also* SJ Ex. 30 at 463–64. In May of 1995, the Indiana Attorney General unveiled a list of 82 businesses engaging in misleading, deceptive, or questionable practices in Indiana, a list that included Career Advancement and Tankersley. SJ Ex. 35Q at 655. The Attorney General's list was discussed during a staff meeting on May 23, 1995, which was led by Tankersley. SJ Ex. 35Q at 654. In August of 1996, the Commonwealth of Pennsylvania filed a civil action against Think Achievement, National Answering Service, New Age Advertising, Tankersley, Patricia Harris, and Harry Brankle, charging them with making false representations to Pennsylvania consumers who were seeking postal jobs. TRO Ex. 32, Att. Z.

As complaints mounted against these two new entities, Tankersley caused H.D. Davidson to be created in October of 1996 to take over New Age Advertising's advertisement operation, TRO Ex. 32, Att. F at 5; he caused Information Delivery System to be created in December of 1996 to take over the order fulfillment operation, TRO Ex. 32, Att. B; and he caused The Answering Service to be created in May of 1997 and then The Rosewood Group in September of 1997 to take over National Answering Service's telemarketing operation, TRO Ex. 38, Att. A; TRO Ex. 37, Att. I. *See also* SJ Ex. 10 ¶ 10; SJ Ex. 24 at 346, 347–48; SJ Ex. 13 at 143; SJ Ex. 16 at 199. This elaborate corporate structure was designed by Tankersley to make it difficult for law enforcement to investigate the Defendants' fraudulent activities and to discourage consumers from pursuing complaints against the Defendants. SJ Ex. 10 ¶ 10. Tankersley created Informa-

tion Delivery System in an attempt to insulate the Defendants from mail fraud prosecutions by having Information Delivery System mail out the booklets ordered by consumers. SJ Ex. 10 ¶ 10.

Even after he removed himself from corporate papers, Tankersley continued to control and direct the operations of the Corporate Defendants. SJ Ex. 10 ¶¶ 12, 13; SJ Ex. 11 ¶¶ 12, 13; SJ Ex. 23 at 315; SJ Ex. 9 ¶¶ 6, 9, 10; SJ Ex. 14 at 165–67, 168–69, 171; SJ Ex. 29 at 455. Tankersley participated in the development of the scripts and rebuttals used by the Defendants' telemarketers and approved script changes. SJ Ex. 38 at 35, 46; SJ Ex. 39 at 63, 68; SJ Ex. 10 ¶ 5; SJ Ex. 11 ¶ 7. Tankersley participated in the development of the advertisements placed by the Defendants in newspapers around the country and directed in which states and when the advertisements would run. SJ Ex. 10 ¶ 4; SJ Ex. 11 ¶ 4; SJ Ex. 35Q at 650; SJ Ex. 18 at 235; SJ Ex. 15 at 181–83; SJ Ex. 29 at 454. Tankersley participated in the development of and changes to the booklets sold by the Defendants. SJ Ex. 38 at 32; SJ Ex. 39 at 66; SJ Ex. 10 ¶ 7. Tankersley conducted regular meetings with the Defendants' supervisory staff in which he directed them on how to run the Defendants' operation. SJ Ex. 10 ¶ 12; SJ Ex. 11 ¶ 12; SJ Ex. 35D; SJ Ex. 35Q. Tankersley controlled the financial aspects of the operation, including directing the opening of bank accounts and determining transfers and allocations of funds among the various Corporate Defendants, SJ Ex. 11 ¶ 13; SJ Ex. 35A; SJ Ex. 35E; SJ Ex. 23 at 317–20; SJ Ex. 35I, and determining who would sign the Corporate Defendants' income tax returns, SJ Ex. 22 at 301–02; SJ Ex. 35U.

Employees understood Tankersley to be the owner and a manager of the Corporate Defendants. SJ Ex. 38 at 17–18; SJ Ex.

15 at 178; SJ Ex. 19 at 247, 248–49, 257; SJ Ex. 16 at 203, 207; SJ Ex. 20 at 271; SJ Ex. 29 at 453, 455; SJ Ex. 17 at 221–22. Throughout the Corporate Defendants' operating history, Tankersley visited their premises and gave instructions to various supervisors and employees. SJ Ex. 15 at 176–78; SJ Ex.10 ¶13; SJ Ex. 11 ¶13; SJ Ex. 29 at 452; SJ Ex. 30 at 465; SJ Ex. 31 at 473, 475, 477–78; TRO Ex. 23 ¶4,10; SJ Ex. 18 at 232; SJ Ex. 19 at 249; SJ Ex. 16 at 203–06; SJ Ex. 20 at 272; SJ Ex. 17 at 220; SJ Ex. 28 at 440. Even when he was away from the Corporate Defendants' offices, he would regularly call in or send facsimiles with instructions and directives. SJ Ex. 38 at 51, 54–55; SJ Ex. 39 at 75. As late as January 1998, Tankersley was directing the payment of monies by the Corporate Defendants. SJ Ex. 23 at 317–20; SJ Ex. 35I; SJ Ex. 11 ¶17; SJ Ex. 35E. In addition, signature stamps bearing Tankersley's signature were found at the Defendants' premises in January 1998. TRO Ex. 37, Att. P.

Relief Defendant Linda Tankersley is the wife of Tankersley. SJ Ex. 3 ¶23. In 1989, Linda Tankersley opened account number 731676 at Centier Bank in Griffith, Indiana. SJ Ex. 35X at 705. From March 13, 1997, until January 28, 1998, there were no transactions on this account, and the account had a balance of $988.90. SJ Ex. 35X at 703. However, beginning on January 28, 1998, less than two weeks after the Commission filed its original Complaint in this action, this account had significant activity involving substantial amounts of money. SJ Ex. 35X at 706. On January 28, 1998, Linda Tankersley's account received three wire transfers: $69,900 and $84,990 from American Century Investors; and $186,695 from T. Rowe Price. SJ Ex. 35X at 706, 707. On February 5, 1998, her account received a wire transfer of $23,846.43 from Warburg Pincus Deposit Account. SJ Ex. 35X at 706, 708. On February 6, 1998, her account received two wire transfers: $39,002.03 from the Torray Fund;[5] and $214,773.72 from Fidelity Investments. SJ Ex. 35X at 706, 709–10. On February 9, 1998, her account received a wire transfer of $27,578.48 from Fidelity Investments. SJ Ex. 35X at 706, 711.

Moneys were removed from this account soon after they were received. On January 30, 1998, Linda Tankersley wrote a check in the amount of $342,014.17 paid to "Cash," which was posted on February 2. SJ Ex. 35X at 706, 713. Of this, $4,000 was issued in cash, and ten money orders (each in the amount of $500.00) and thirteen cashier's checks were issued. SJ Ex. 35X at 713. Recipients of cashier's checks included the Law Firm of Ruman Clements Tobin and Holub (which received $100,000); Robert K. Stallwood, Attorney at Law (who received $24,500); and the Internal Revenue Service (which received four checks totaling $160,000); as well as several credit card companies. SJ Ex. 35X at 714–25. On February 6, 1998, Linda Tankersley wrote a check in the amount of $27,044 paid to "Centier." SJ Ex. 35X at 706, 726. From this amount, $7,000 was issued in cash, and ten money orders (each in the amount of $500.00) and six cashier's checks were issued. SJ Ex. 35X at 726–34. Recipients of these cashier's checks included the local power, water, and gas companies. SJ Ex. 35X at 726–34. On February 6, 1998, Linda Tankersley also wrote a check in the amount of $30,000 paid to "Centier." SJ Ex. 35X at 706, 735. The entire amount was issued as a cashier's check payable to Sarkisian and Flem-

---

**5.** This wire was returned to the Torray Fund on February 9, 1998, due to a wire error. SJ Ex. 35X at 703, 706.

ing, Attorneys at Law. SJ Ex. 35X at 735. On February 9, 1998, Linda Tankersley wrote a check in the amount of $6,500 paid to "Cash." SJ Ex. 35X at 706, 736. On February 17, 1998, the Commission counsel served a copy of the Second TRO on Centier Bank, at which point Centier Bank froze Linda Tankersley's account, which had a balance of $203,304.36. SJ Ex. 35X at 704.

Linda Tankersley is also a co-trustee (together with Tankersley) of the Linda S. Tankersley Revocable Trust, SJ Ex. 34 at 552–53, and the William H. Tankersley Revocable Trust, SJ Ex. 34 at 555–56. These trusts maintain or maintained accounts with Fidelity Investments, Schabacker Investments, The Royce Funds, Twentieth Century Funds (now called American Century Investments), Scudder Funds, Vanguard Group, Mutual Discovery, Shares, and Beacon Funds (part of Franklin Templeton Group), T. Rowe Price, and the PBHG Funds. SJ Ex. 34 at 554, 557–69. She and Tankersley have established two Land Trusts, which identify them as the beneficiaries and which took title to property located in Hamilton County, Indiana. SJ Ex. 34 at 570–75.

Between March of 1992 and January 1, 1998, Tankersley transferred at least $3,158,000 from his personal account at SouthTrust Bank to various mutual funds currently owned by the two revocable trusts. SJ Ex. 32 at 521–36 ($1,478,000 to Fidelity Investments; $425,000 to Mutual Financial Services (Franklin Templeton Group); $30,000 to the Torray Fund; $20,000 to Warburg Pincus Funds; $180,000 to American Century Investments; $75,000 to PBHG Funds; $275,000 to Vanguard; $200,000 to Dreyfuss; $375,000 to Scudder Funds; and $100,000 to T. Rowe Price). Tankersley received at least $1,075,500 from Career Advancement.[6] SJ Ex. 32 at 486–506; SJ Ex. 33 at 538–48.

## B. The Business Practices

Since approximately September of 1991, the Defendants participated in a nationwide telemarketing scheme selling postal examination preparation materials to consumers. SJ Ex. 10 ¶ 4; SJ Ex. 11 ¶ 4; SJ Ex. 23 at 316; TRO Ex 23 ¶ 5. The U.S. Postal Service ("Postal Service") is an independent, self-supporting federal agency within the executive branch of the Government of the United States. 39 U.S.C. §§ 101, 201; SJ Ex. 12 ¶ 5. The Postal Service is the largest civilian employer in the United States. SJ Ex. 12 ¶ 6. The seven most common entry-level, career positions include city carriers, clerks, flat sorter machine operators, mail handlers, mail processors, machine distribution clerks, and mark-up clerks. SJ Ex. 12 ¶ 9. As of January of 1998, the starting wages for these positions range from $11.43 to $13.42 per hour. SJ Ex. 12 ¶ 11. Applicants for these positions do not need to have graduated from high school, and permanent resident aliens are eligible along with U.S. citizens. SJ Ex. 12 ¶ 8.

---

**6.** Tankersley took his share of the Defendants' profits through Career Advancement. SJ Ex. 11 ¶ 11. He also took profits through a third-party entity that received money from the Corporate Defendants, a company called Paterlic Marketing, which Tankersley owned and which was his personal consulting company. SJ Ex. 11 ¶ 11. Paterlic Marketing received at least $163,080 from the Corporate Defendants. SJ Ex. 35Z at 747–50. Paterlic Marketing's bank account is with the Isle of Man branch of the Royal Bank of Canada. SJ Ex. 35Z at 748, 750. Educational Seminars Group, another company owned and controlled by Tankersley, SJ Ex. 35W; SJ Ex. 35T; SJ Ex. 35Y at 738; SJ Ex. 17 at 222; SJ Ex. 23 at 314; SJ Ex. 22 at 306–07; TRO Ex. 36 ¶ 3–4, Att. A, received at least $1,243,288 in deposits from the Corporate Defendants, SJ Ex. 35Y at 740–45. Tankersley, in turn, received at least $1,658,756 from Educational Seminars Group. SJ Ex. 32 at 487, 507–20.

Furthermore, all applicants for these positions must take a competitive written examination known as Test 470. SJ Ex. 12 ¶ 9. Test 470 measures basic cognitive ability and speed, and not all individuals are capable of achieving a 95 or higher on Test 470, regardless of how much they study or practice for that exam. SJ Ex. 12 ¶ 34. Applicants must obtain a scaled score of 70 or higher (out of a possible 100) on Test 470 to pass. SJ Ex. 12 ¶ 16. While about three-fourths of all applicants receive passing scores, less than 0.5% receive scaled scores of 95 or higher on Test 470. SJ Ex. 12 ¶ 17. Obtaining a high score is important because the Postal Service lists applicants on hiring registers by exam score, and applicants with the highest scores are the first to be hired. SJ Ex. 12 ¶ 21. Veterans of the armed services receive preferences in the Postal Service hiring process, and additional points are added to the Test 470 scores of some veterans. SJ Ex. 12 ¶¶ 20, 28–33. The Postal Service does not offer Test 470 on a regular basis, but rather would offer the test when local personnel needs warrant offering it and when the number of applicants in a particular register is too low. SJ Ex. 12 ¶ 23. When a postal district decides to offer Test 470, the district will publicize an announcement that the test will be offered and will allow applicants a brief period of time to submit application materials. SJ Ex. 12 ¶¶ 24, 26. When a district announces that it will offer Test 470, a large number of individuals typically apply to take the examination. SJ Ex. 12 ¶ 25. The Postal Service does not hire private firms to recruit or screen applicants. SJ Ex. 12 ¶ 25.

The Defendants placed classified advertisements in the employment information, help wanted, employment services, and job services sections of newspapers across the country. SJ Ex. 2 ¶ 27; SJ Ex. 15 at 175, 175a; SJ Ex. 11 ¶¶ 4, 5; SJ Ex. 35 Att. J; SJ Ex. 35 Att. O at 637; TRO Ex. 27,

¶¶ 3–4; TRO Ex. 28, ¶ 3; TRO Ex. 29, ¶ 3; SJ Ex. 18 at 229–30; SJ Ex. 17 at 218–19. A large percentage of their advertisements contained the phrases "ATTENTION [CITY]" (referencing the specific geographical area in which that particular newspaper circulated) and "POSTAL JOBS" and invited consumers to dial a toll-free telephone number for application and exam information. TRO Ex. 1, Att. A ("ATTENTION TULSA"); TRO Ex. 2, Att. A; TRO Ex. 6, Att. A; TRO Ex. 16, Att. A; TRO Ex. 18, Att. A; TRO Ex. 21, Att. A; TRO Ex. 32, Att. G; SJ Ex. 18 at 230; TRO Ex. 32, Att. G at 3, 4, 6, 10, 12, 13; TRO Ex. 32, Att. AA at 5–6. Although their advertisements suggested that postal jobs were available and invited consumers to telephone a number for application and exam information, the Defendants' advertisements did not state that the advertisement was being placed by a private company. *See* TRO Ex. 1, Att. A; TRO Ex. 2, Att. A; TRO Ex. 6, Att. A; TRO Ex. 16, Att. A; TRO Ex. 18, Att. A; TRO Ex. 21, Att. A; TRO Ex. 32, Att. G. It was the Defendants' policy not to place language such as "not affiliated with the Postal Service" in their advertisements. SJ Ex. 18 at 234–35; SJ Ex. 15 at 182–83. The Defendants would place "not affiliated" language in their advertisements only when required to do so by a newspaper. SJ Ex. 18 at 234–35; SJ Ex. 15 at 182–83. Newspapers sometimes required such "not affiliated" language because some of their readers would assume that the Defendants' advertisements were place by the Postal Service. SJ Ex. 18 at 234.

In addition, the Defendants' policy was to place their advertisements in the "Help Wanted" sections of newspapers, implying that jobs were available locally. SJ Ex. 38 at 21; SJ Ex. 39 at 60, 62; SJ Ex. 18 at 234; SJ Ex. 29 at 454; TRO Ex. 2, Att. A; TRO Ex. 16, Att. A; TRO Ex. 18, Att. A; TRO Ex. 32, Att. G at 4, 11, 13. Some

newspapers, however, required that the advertisements be run in the "Employment Services" or "Employment Information" sections. SJ Ex. 18 at 233; SJ Ex. 29 at 454. Tankersley sought to use the advertisements to lead consumers to believe that they were dealing with the Postal Service and that jobs were actually available. SJ Ex. 38 at 23–24, 38–39; SJ Ex. 39 at 80–81; SJ Ex. 11 ¶ 4; SJ Ex. 29 at 456a. Tankersley explained that if people thought jobs were actually available, they would be more likely to purchase the Defendants' materials. SJ Ex. 11 ¶ 4. The Defendants placed advertisements in newspapers without regard to whether the test was being offered or postal jobs were actually available in their circulation areas. SJ Ex. 11 ¶ 5. Instead, the decisions where and when to run advertisements were based on whether the advertisements had previously been successful in a certain region and whether it would make money. SJ Ex. 11 ¶ 5. Moreover, if the Defendants learned that no postal job was open or that the Postal Service was not offering Test 470 in a particular location where the Defendants' advertisements were running, the Defendants had no policy not to run or to stop running such advertisements. SJ Ex. 18 at 239–40; SJ Ex. 15 at 185.

The Defendants employed a team of telemarketers to answer the incoming calls of consumers responding to their advertisements. TRO Ex. 23 ¶ 12–14; SJ Ex. 24 at 338–39; SJ Ex. 29 at 445. The telemarketers were provided with written sales scripts to read when consumers called in response to the advertisements. TRO Ex. 23 ¶ 5, Att. A; TRO Ex. 38, ¶ 9, Att. D; SJ Ex. 24 at 349; SJ Ex. 35F; SJ Ex. 13 at 149; SJ Ex. 16 at 192; SJ Ex. 20 at 263, 274. Telemarketers were required to read the script as written, and any telemarketer who was caught deviating from or violating the script was subject to discipline of a written warning, suspension, or termination. SJ Ex. 24 at 345, 351–52, 360, 370;

SJ Ex. 16 at 200; SJ Ex. 20 at 262; TRO Ex. 38, Att. H ¶ 14; SJ Ex. 13 at 138–39, 149–50.

The Defendants' telemarketers answered the telephone with the phrase "employment information" or "employment information office," then asked whether the consumer was interested in applying for a position with the Postal Service. TRO Ex. 32, Att H–M; TRO Ex 38, Att D at 1. Tankersley discussed with his managers the fact that the Defendants' telemarketers were instructed to answer the telephone using the phrase "employment information office," for the purpose of making consumers believe they were dealing with the Postal Service or with an entity affiliated with the Postal Service. SJ Ex. 39 at 80–81; SJ Ex. 10 ¶ 6; SJ Ex. 29 at 456; SJ Ex. 31 at 479–80. The telemarketer would tell the caller that she would be "conducting your pre-qualifying interview today," ask whether the call was interested in applying for a position with the Postal Service, and then ask the following five questions: (1) whether the consumer was at least 18 years of age; (2) whether the consumer was in good physical health; (3) what the last grade of education completed by the consumer was; (4) whether the consumer could pass a drug screening test; and (5) whether the consumer was able to start within two weeks of their hire date. SJ Ex. 13 at 151; TRO Ex 32, Att. H–M; TRO Ex. 38, Att D. at 1. As long as the consumer answered in the affirmative to the first and fourth questions, the telemarketer would state that the consumer was "pre-qualified" for sorter, clerk, and carrier positions. SJ Ex. 20 at 264, 273; SJ Ex. 24 at 350; SJ Ex. 13 at 152; SJ Ex. 16 at 193–94; TRO Ex. 32, Att. H–M; TRO Ex. 38, Att. D at 1.

The telemarketer would promise to mail an application for "sorter, clerk and carrier

positions," would offer to provide application information and materials explaining the qualifications and job descriptions so "you can apply for the position of your choice," would include "our exclusive hot-line number" that would give the consumer "up-to-date information on all job openings" as well as thirty practice tests "just like the ones on the real exam," and would ask whether the caller was "looking to start right away." TRO Ex. 32, Atts. H–M; SJ Ex. 35F; TRO Ex. 23, Att. A; TRO Ex. 21 ¶ 3; TRO Ex. 38, Att. D at 1. The telemarketer would advise that there is a "one-time registration fee" of $39.95, plus $7 for shipping and handling, for a total of $46.95. TRO Ex. 32, Att. H–M; TRO Ex. 38, Att. D at 1. The telemarketer would assure the caller with the following guarantee:

> Because of our faith in the program, it comes with our full, unconditional money-back guarantee. We guarantee, in writing, that you will score 95–100% on the exam and receive a job with the Postal Service within 30 days of your interview or your money will be immediately refunded in full.

TRO Ex. 32, Atts. H–M; TRO Ex. 23, Att. A; TRO Ex. 38, Att. D at 1; SJ Ex. 20 at 266, 276; SJ Ex. 16 at 195–96; SJ Ex. 24 at 337; SJ Ex. 13 at 141. No conditions to or limitations on obtaining a refund were disclosed to the consumer prior to purchasing the Defendants' product. SJ Ex. 24 at 343–44; SJ Ex. 13 at 146–47; SJ Ex. 16 at 209; SJ Ex. 20 at 276; SJ Ex. 31 at 481–82. The telemarketer would then ask: "how will you be applying?" TRO Ex. 32, Atts. H–M; TRO Ex. 23, Att. A.

Unbeknownst to the caller, the Defendants actually had two refund policies-one for consumers who purchased using a credit card, and another for consumers who purchased by C.O.D. or using a debit of their checking account. SJ Ex. 10 ¶¶ 8, 9; SJ Ex. 11 ¶¶ 8, 9. The Defendants differentiated consumers at the order-taking stage: telemarketers used one order form for credit card orders, SJ Ex. 35M; and a different order form for check debit orders. SJ Ex. 35N. *See also* SJ Ex. 19 at 251–52; SJ Ex. 20 at 270; SJ Ex. 24 at 353–54; SJ Ex. 23 at 321.

Although consumers paid the same amount of money and were sent the same booklets, the money back guarantee differed between credit card purchasers, TRO Ex 32, Attach. P, and check debit purchasers, TRO Ex. 31, Attach. H. Credit card purchasers received packets from "Career Guides" at 2533 N. Carson Street, Carson City, Nevada. TRO Ex 32, Attach. P. For credit card purchasers, the money back guarantee informed them that they had to return the entire packet and a copy of their credit card statement in order to get a refund. TRO Ex. 32, Attach. P at 4; SJ Ex. 18 at 237, 241–42; SJ Ex. 19 at 255–56. The guarantee was valid for only 12 months, and refunds were routinely denied to consumers who returned their packets too late.[7] TRO Ex. 32, Attach. P at 4; SJ Ex. 23 at 329–31; SJ Ex. 35L. These conditions, however, were not disclosed to consumers prior to purchase. SJ Ex. 24 at 343–44; SJ Ex. 13 at 146–47; SJ Ex. 16 at 209; SJ Ex. 20 at 276; SJ Ex. 31 at 481–82. The guarantee sent to credit card purchasers also provided a customer service number (which was a toll call) that rang into the Defendants' Crown Point, Indiana office. SJ Ex. 23 at 322–23. When consumers called that customer service number, the Defendants' representatives would ask whether the consumer had

---

7. Apparently, no time limit was imposed on consumers from Wisconsin, Pennsylvania, Ohio, Indiana and Illinois because of prior lawsuits and other inquiries by the Attorneys General Offices of those states. SJ Ex. 23 at 332–33; SJ Ex. 35L at 629, 631; SJ Ex. 10 ¶ 8; SJ Ex. 11 ¶ 8.

already contacted his or her credit card company, and if the consumer had contacted her credit card company, the Defendants would promptly credit that consumer's credit card. SJ Ex. 19 at 253, 254, 258; SJ Ex. 23 at 326–27; SJ Ex. 35K. If the consumer had not yet contacted her credit card company, the Defendants would instead write a check, made payable to the consumer's credit card company, and mail the check to the consumer. SJ Ex. 19 at 253, 254, 258; SJ Ex. 23 at 326–27; SJ Ex. 35K.

Check debit purchasers received their packets from "Employment Network Center" at 10800 Alpharetta Highway, Roswell, Georgia. TRO Ex. 31, Attach. H. The money back guarantee informed consumers that they had to try the program for 90 days before they could get a refund. *Id.* at 4. The guarantee also required that the consumer return the entire packet and provide proof that she stayed in contact with the Defendants' hotline. *Id.* As with the credit card guarantee, the check debit guarantee was only valid for 12 months. *Id.* Again, none of these conditions were disclosed to consumers prior to purchase. SJ Ex. 24 at 343–44; SJ Ex. 13 at 146–47; SJ Ex. 16 at 209; SJ Ex. 20 at 276; SJ Ex. 31 at 481–82; TRO Ex. 7, ¶ 6; TRO Ex. 11, ¶¶ 4–5; TRO Ex. 13, ¶ 6; TRO Ex. 14, ¶ 5; TRO Ex. 15, ¶ 4; TRO Ex. 16, ¶ 5; TRO Ex. 17 ¶¶ 6–7; TRO Ex. 18, ¶ 5; TRO Ex. 20, ¶ 4; *see also* TRO Ex. 6, ¶ 6; TRO Ex. 21, ¶ 6; TRO Ex. 10, ¶ 5. No customer service number was provided to consumers purchasing by check, requiring them to remember the original number called when ordering. TRO Ex. 31, Attach. H at 4.

According to the Defendants' managers, their bifurcated refund policy was designed to discourage consumers from complaining and getting refunds, while not jeopardizing the Defendants' credit card merchant accounts. SJ Ex. 38 at 30; SJ Ex. 10 ¶¶ 8, 9; SJ Ex. 11 ¶¶ 8, 9. Many credit card purchasers who made refund requests did receive refunds, SJ Ex. 10 ¶ 8; SJ Ex. 11 ¶ 8; SJ Ex. 29 at 446, 448, although not every credit card purchaser did, TRO Ex. 6 ¶ 6; TRO Ex. 19 ¶ 4; SJ Ex. 38 at 41–43; SJ Ex. 23 at 329, 330–31; SJ Ex. 35L. Check or C.O.D. purchasers rarely received refunds. SJ Ex. 38 at 19, 29–30; SJ Ex. 10 ¶ 9; SJ Ex. 11 ¶ 9; SJ Ex. 29 at 446, 447, 450; TRO Ex. 2 ¶¶ 5–6; TRO Ex. 3 ¶ 10; TRO Ex. 4 ¶ 4; TRO Ex. 5 ¶¶ 6–7; TRO Ex. 7 ¶ 8; TRO Ex. 11 ¶ 5; TRO Ex. 13 ¶ 9; TRO Ex. 14 ¶ 6; TRO Ex. 15 ¶ 6; TRO Ex. 16 ¶ 10; TRO Ex. 18 ¶ 9. Indeed, one North Carolina resident attempted for two years to obtain a refund, without success. TRO Ex. 18 ¶¶ 5–9. If check or C.O.D. purchasers received a refund at all, they did so only when they complained numerous times to the Defendants or filed complaints with a Better Business Bureau or a law enforcement agency. SJ Ex. 38 at 25, 35–36; SJ Ex. 10 ¶ 9; SJ Ex. 11 ¶ 9; SJ Ex. 29 at 446; TRO Ex. 8, ¶ 7; TRO Ex. 10; TRO Ex. 17; TRO Ex. 20, ¶ 6; TRO Ex. 21, ¶ 7.

With regard to the guarantee of a score of 95 to 100 percent on the postal examination, less than 0.5% of all applicants have scored 95 or higher on Test 470 since the exam was first offered in 1993. SJ Ex. 12 ¶ 17. The Commission's expert reviewed the entire set of the Defendants' materials and found no tricks or tips that would assure readers of a high score on Test 470. SJ Ex. 12 ¶¶ 36–42. The Commission's expert testified that, while test preparation may (by reducing unfamiliarity or nervousness) enable an individual to achieve moderate improvement in her score, significant improvement was not statistically likely, and that test preparation using the Defendants' materials would not guarantee that a person would score 95 or higher on Test 470. SJ Ex. 12 ¶ 40. The Defendants' expert testified that the Defendants never

studied the population of people who purchased their materials to determine whether their materials aided consumers in getting high scores on Test 470. SJ Ex. 21 at 286. The Defendants' expert could not testify that consumers using the Defendants' materials would score 95 or better on Test 470. SJ Ex. 21 at 284a, 287, 288, 289. Although the Defendant's expert stated that he thought it would be likely that a person could score 95 or higher on Test 470 using the Defendants' materials, following the techniques, and putting enough time in,[8] SJ Ex. 21 at 285, he later qualified that statement to say that it may be possible, SJ Ex. 21 at 287, 288, 289. The Defendants' expert agreed that it would be a waste of money and not worthwhile to purchase the Defendants' materials if Test 470 were not being offered. SJ Ex. 21 at 290.

In addition to the written script, the Defendants provided the telemarketers with written rebuttal sheets to answer consumer questions. TRO Ex. 23, ¶¶ 12–14, Att. B; TRO Ex. 38, ¶ 9, Att. D at 2; SJ Ex. 16 at 210; SJ Ex. 13 at 150; SJ Ex. 24 at 355; SJ Ex. 35G. As with the script, telemarketers were not allowed to deviate from the language of the rebuttal sheets. SJ Ex. 24 at 356, 370; SJ Ex. 20 at 275; SJ Ex. 16 at 210; SJ Ex. 13 at 138–39, 150, 159.

One rebuttal sheet provides that, when asked whether the telemarketer was affiliated with the actual company that was hiring, the telemarketer was to respond "this is the employment information office for postal careers." TRO Ex. 32, Att. H at 4, Att. I at 5; Att. L at 4; TRO Ex 38, Att. D at 2; SJ Ex. 20 at 275; SJ Ex. 13 at 153–54, 158; SJ Ex. 16 at 189–90, 211; TRO Ex. 23 ¶ 17. The Defendants instructed their telemarketers to sidestep such questions, rather than admit that they were unrelated to the Postal Service. TRO Ex. 23, ¶ 16. With operator-assisted calls from deaf customers, the Defendants permitted the telemarketers to disclose that "we are not the post office." TRO Ex. 23, ¶ 17; TRO Ex 32, Att H at 4, Att I at 5; Att L at 4; TRO Ex 38, Att. D at 2. Many customers who called about postal jobs asked if the Defendants were part of the Postal Service. TRO Ex. 23 ¶ 15; SJ Ex. 20 at 279; SJ Ex. 30 at 466. Consumers who purchased materials from the Defendants consistently believed that the advertisements were placed by the Postal Service, and that the telemarketers were working for or on behalf of the Postal Service. TRO Ex. 1, ¶ 3; TRO Ex. 2, ¶¶ 3–4; TRO Ex. 3, ¶¶ 3–4; TRO Ex. 4, ¶ 2; TRO Ex. 5, ¶¶ 2–3; TRO Ex. 6, ¶ 3; TRO Ex. 7, ¶ 2; TRO Ex. 8, ¶ 2; TRO Ex. 9, ¶¶ 3–4; TRO Ex. 10, ¶¶ 2–3; TRO Ex. 12 ¶ 2; TRO Ex. 13 ¶ 2; TRO Ex. 14 ¶ 2; TRO Ex. 15, ¶¶ 2–3; TRO Ex. 16 ¶ 2; TRO Ex. 18 ¶ 2; TRO Ex. 19 ¶ 2; TRO Ex. 20, ¶¶ 2–3; TRO Ex. 21 ¶ 2; TRO Ex. 22 ¶ 2.

The rebuttal sheet also instructs that, when asked whether there was a job in the consumer's geographical area, telemarketers were to respond that "[o]ur research department updates the hotline number weekly. The hotline number will tell you about applying in your area." TRO Ex. 38, Att D. at 2; SJ Ex. 16 at 191, 208–09. When the Commission's investigator asked whether there were jobs open in her area, a telemarketer responded that "the hotline number will give you the date, time and location of all your exams, how to apply in your area, and all job openings." *Id.*, Att. M, at 3, 7; Att. J at 4; *see also* SJ Ex. 24

---

**8.** The Defendants' expert testified that he did not consider himself to be an expert with respect to Test 470 or any aspect of the Postal Service or its development of test scores and that he had not seen or taken Test 470. Pl.'s Mot. Strike Def.'s Ex. in Supp. Opp'n to Summ. J., Ex. 1.

at 342; SJ Ex. 13 at 147. Consumers who paid the Defendants recalled that when they read the advertisements and spoke with the telemarketers, they believed that permanent postal jobs were locally available. TRO Ex. 2, ¶ 3; TRO Ex. 3, ¶¶ 3–6; TRO Ex. 4, ¶ 2; TRO Ex. 5, ¶¶ 2–4; TRO Ex. 6, ¶¶ 3–6; TRO Ex. 9, ¶¶ 3–6; TRO Ex. 14, ¶ 2; TRO Ex. 15, ¶ 2; TRO Ex. 19, ¶¶ 2–4. One consumer asked the telemarketer "very specifically if the job was guaranteed and she said yes. She promised me a job in two weeks." While the consumer was waiting for the materials to arrive in the mail, she passed up a job opportunity, thinking that she "had her future all in order with a postal career." TRO Ex. 9, ¶¶ 4–5; *see also* TRO Ex. 3, ¶ 4; TRO Ex. 6, ¶ 3; TRO Ex. 8, ¶ 3; TRO Ex. 10, ¶ 3; TRO Ex. 13, ¶ 3; TRO Ex. 17, ¶ 3. In many of the areas where the Defendants' advertised, postal jobs simply were not available to the public. SJ Ex. 12 ¶ 23; SJ Ex. 29 at 449, 451; TRO Ex. 3, ¶ 5; TRO Ex. 6, ¶ 5; TRO Ex. 9, ¶ 6; TRO Ex. 14, ¶ 6; TRO Ex. 17, ¶ 5; TRO Ex. 19, ¶ 4; TRO Ex. 22, ¶ 4. One consumer recalled: "[W]hen I went down to the post office in Angola [Indiana], they told me that there were no openings, so the materials I had purchased were useless. I felt deceived." TRO Ex. 19, ¶ 4. Other consumers realized that jobs were not available when they dialed the Defendants' "postal exam hotline" and heard no mention of local employment. TRO Ex. 4, ¶ 3; TRO Ex. 8, ¶ 5. When consumers called to complain that no jobs were in fact available, the telemarketers' response was that the consumers should keep calling the hotline. SJ Ex. 16 at 208. Indeed, in November and December of 1997, while the Defendants' telemarketers were touting the availability of permanent clerk, carrier, and sorter positions to more than 200,000 callers, *see* TRO Ex. 25, ¶¶ 5–6, the "postal exam hotline" listed no such jobs. TRO Ex. 32, Att. W. Apart from part-time, non-

career "rural carrier associate" jobs, the positions listed on the hotline during this period (*e.g.,* clerk/stenographers and mechanics) required some degree of technical proficiency. TRO Ex. 30, at 11.

Job seekers who paid the $46.95 fee usually received an envelope within several weeks by U.S. Mail. At least one consumer never received any materials or a refund from the Defendants, even though she paid the fee. TRO Ex. 2 ¶ 5. The envelope contained several booklets on the Postal Service hiring process, including supposed tips and practice questions for postal exams. TRO Ex. 32, Att P, Q, R, S, T, U, V. The booklets contained no listing of particular job openings; rather, consumers were instructed to dial a "postal exam hotline," a toll call with a Nevada area code, for information on current openings. TRO Ex. 32, Att. P, at 3; *see also id.,* Att. W. One booklet was titled "Employment Manual & Preparation Guide for U.S. Postal Exams." TRO Ex. 32, Att. S. The back cover proclaimed: "How to Score 95+ on the U.S. Postal Exam," and the first page of the document (in the second paragraph) represented: "How to take the exam is far more important than 'brains.' You can learn how to score high on the test . . . extremely high." TRO Ex. 32, Att. S. Much of the information in the booklets was outdated and erroneous. SJ Ex. 12 ¶¶ 43–66. For example, the Defendants' materials refer to exams that are no longer offered by the Postal Service, TRO Ex. 32, Att. P at 2, Att. S at 38–53, Att. T at 2, 15, Att. S at 22, and application procedures discontinued years ago by the Postal Service, TRO Ex. 32, Att. P at 3, Att. Q at 1, Att. U at 27–30.

In addition to the Defendants' corporate structure, the Defendants in mailing the materials to consumers would attempt to conceal their identity and base of operations, postmarking envelopes "South Sub-

urban IL," but varying the business names and return addresses. TRO Ex. 32, Att. N. For a listing of some of the business names and addresses used by the Corporate Defendant, see *supra* section identifying material facts regarding the parties. Tankersley explained to one of his managers that he set up the elaborate mailing system in order to keep complaints from building up at any specific mailing address, to dissuade consumers from complaining, and to keep consumers from knowing where to send their complaints. SJ Ex. 10 ¶ 11.

The telemarketers did not receive complaints on the toll-free lines; instead, they instructed consumers to dial a customer service line, usually 219–736–4680, which was not toll-free and was answered fewer hours than the toll-free lines. SJ Ex. 23 at 322–23; SJ Ex. 29 at 447a, 450a. Moreover, consumers reported that they had difficulty getting through on this line and that their messages were never returned. TRO Ex. 2, ¶ 5; TRO Ex. 4, ¶ 4; TRO Ex. 8, ¶ 7; TRO Ex. 16, ¶ 5; TRO Ex. 19, ¶ 4; TRO Ex. 22, ¶ 6; SJ Ex. 30 at 467–68; SJ Ex. 31 at 474.

## ANALYSIS

Section 5(a) of the FTC Act provides: "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful." 15 U.S.C. § 45(a). This Court has jurisdiction in cases brought under the FTC Act. 15 U.S.C. §§ 45(a) & 53(b); 28 U.S.C. §§ 1331, 1337(a), 1345. Because the Defendants' nationwide telemarketing activities affected the passage of property or messages from one state to another, they constitute acts or practices in or affecting commerce under the FTC Act. *Ford Motor Co. v. FTC*, 120 F.2d 175, 183 (6th Cir.), *cert. denied*, 314 U.S. 668, 62 S.Ct. 130, 86 L.Ed. 535 (1941). Because a substantial part of the events and conduct giving rise to this claim occurred in this District and because the Defendants are located in Merrillville and Crown Point, Indiana, venue is proper pursuant to 28 U.S.C. § 1391(b)-(c). Moreover, Tankersley and Linda Tankersley each admit that the Court has jurisdiction and that venue in this District is proper. SJ Ex. 1 ¶¶ 2, 3; SJ Ex. 3 ¶¶ 2, 3.

An act or practice is deceptive under Section 5(a) if it involves a material representation or omission that would likely mislead consumers, acting reasonably under the circumstances, to their detriment. *Kraft, Inc. v. FTC*, 970 F.2d 311, 314 (7th Cir.1992), *cert. denied*, 507 U.S. 909, 113 S.Ct. 1254, 122 L.Ed.2d 652 (1993); *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029 (7th Cir.1988). The standards governing this Court's determination are well established:

> [M]isrepresentations of material facts made for the purpose of inducing consumers to purchase services constitute unfair or deceptive acts or practices forbidden by Section 5(a). To be actionable under section 5, these misrepresentations or practices need not be made with an intent to deceive. Indeed, [a]n advertiser's good faith does not immunize it from responsibility for its misrepresentations.... Moreover, the omission of material information, even if an advertisement does not contain falsehoods, may cause the advertisement to violate section 5.

*Id.* (internal quotation marks and citations omitted). Deception may be by innuendo rather than outright false statements, *National Bakers Servs., Inc. v. FTC*, 329 F.2d 365, 367 (7th Cir.1964); *Rhodes Pharmacal Co. v. FTC*, 208 F.2d 382, 387 (7th Cir.1953), and a statement may be deceptive even if the constituent words may be literally or technically construed so as not to constitute a misrepresentation, *Kal-*

*wajtys v. FTC,* 237 F.2d 654, 656 (7th Cir.1956); *Rothschild v. FTC,* 200 F.2d 39, 42 (7th Cir.1952); *D.D.D. Corp. v. FTC,* 125 F.2d 679, 681 (7th Cir.1942). *See also Sebrone Co. v. FTC,* 135 F.2d 676, 679 (7th Cir.1943) ("Words and sentences may be literally and technically true and yet be framed in such a setting as to mislead or deceive."). Actual deception of the consumers need not be proven; rather, the likelihood of deception or the capacity to deceive is the criterion by which the advertising is judged. *Montgomery Ward & Co. v. FTC,* 379 F.2d 666, 670 (7th Cir. 1967); *Parker Pen Co. v. FTC,* 159 F.2d 509, 511 (7th Cir.1946); *Vacu–Matic Carburetor Co. v. FTC,* 157 F.2d 711 (7th Cir.1946) ("The law is settled that a finding of tendency and capacity to mislead is sufficient and that actual deception need not be shown.") (internal quotation marks and citations omitted).

The important criterion in determining the meaning of an advertisement is the net impression that it is likely to make on the general populace. *National Bakers,* 329 F.2d at 367. The ultimate impression of these advertisements upon the minds of the purchasing public is primary, and the meaning of the words used, as well as all that is reasonably implied. *Niresk Indus., Inc. v. FTC,* 278 F.2d at 342; *Aronberg,* 132 F.2d at 167. The determination is not restricted to a consideration of what impression an expert or careful reader would draw from the advertisements, but rather involves viewing the advertisement as it would be seen by the public generally which includes the ignorant, the unthinking and incredulous, who, in making purchases, do not stop to analyze but too often are governed by appearances and general impressions. *Niresk,* 278 F.2d at 342; *Aronberg,* 132 F.2d at 167. Thus, being mindful of the fact that the buying public does not weigh each word in an advertisement or a representation, the Court will consider the impression that is likely to be created upon the prospective purchaser. *Kalwajtys,* 237 F.2d at 656; *Aronberg v. FTC,* 132 F.2d 165, 167 (7th Cir.1942).

Among the business practices determined to be fraudulent or deceptive are the following: using labels or trade names in a manner having a capacity or tendency to mislead the purchaser, *Niresk Indus., Inc. v. FTC,* 278 F.2d 337, 340 (7th Cir. 1960); *Lighthouse Rug Co. v. FTC,* 35 F.2d 163, 165–66 (7th Cir.1929); *see also U.S. Navy Weekly, Inc. v. FTC,* 207 F.2d 17 (D.C.Cir.1953) (use of the name U.S. Navy Weekly, a privately owned, unofficial publication, not associated with the United States Navy, was misleading and deceptive and adding qualifying or explanatory language would not eliminate the deception); *FTC v. Army and Navy Trading Co.,* 88 F.2d 776, 778–80 (D.C.Cir.1937) (the use of the words "Army and Navy" in the Trading Company's name is an unfair method of competition in that it constitutes a false and misleading representation as to the origin, nature, or quality of a commodity and that adding qualifying or explanatory language would not eliminate the deception); setting up corporations to forestall claims made by customers who were victims of fraudulent schemes, *International Art Co. v. FTC,* 109 F.2d 393, 396–97 (7th Cir.1940); advertisements that promote guarantees that ultimately vary from the guarantee certificate or that fail to state significant limitations, *Montgomery Ward & Co. v. FTC,* 379 F.2d 666, 671 (7th Cir.1967); *see also Clinton Watch Co. v. FTC,* 291 F.2d 838, 840 (7th Cir.1961), *cert. denied,* 368 U.S. 952, 82 S.Ct. 395, 7 L.Ed.2d 386 (1962) (advertising of a "lifetime guarantee" on watches without clearly disclosing that a service charge was required for repairs or adjustments is an unfair and deceptive trade practice); and the failure to disclose material facts that could affect consumers' decisions, i.e., the conditions for obtaining refunds, the condi-

tions and costs associated with participating in a program, and the true nature of the service or product offered, *FTC v. Febre*, 1996 WL 396117 (N.D.Ill. July 3, 1996), *aff'd*, 128 F.3d 530 (7th Cir.1997).

■ Where one or more corporate entities operate in common enterprise, each may be held liable for the deceptive acts and practices of the others. *Sunshine Art Studios, Inc. v. FTC*, 481 F.2d 1171, 1175 (1st Cir.1973); *Delaware Watch Co. v. FTC*, 332 F.2d 745, 746–47 (2d Cir.1964). Factors in determining common enterprise include: (1) common control, *Sunshine Art*, 481 F.2d at 1175; *Waltham Precision Instrument Co. v. FTC*, 327 F.2d 427, 431 (7th Cir.), *cert. denied*, 377 U.S. 992, 84 S.Ct. 1918, 12 L.Ed.2d 1045 (1964); (2) sharing office space and offices, *Zale Corp. & Corrigan–Republic, Inc. v. FTC*, 473 F.2d 1317, 1320 (5th Cir.1973); *Delaware Watch*, 332 F.2d at 746; (3) whether business is transacted through a "maze of interrelated companies," *id.*; and (4) commingling of funds, *SEC v. Elliott*, 953 F.2d 1560, 1565 n. 1 (11th Cir.1992).

■ Once corporate liability is established, an individual defendant may be held liable when the individual either directly participated in deceptive practices that violated the FTC Act or had the ability to control such practices. *FTC v. Standard Educ. Soc'y*, 302 U.S. 112, 119, 58 S.Ct. 113, 82 L.Ed. 141 (1937); *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 573 (7th Cir.), *cert. denied*, 493 U.S. 954, 110 S.Ct. 366, 107 L.Ed.2d 352 (1989). Authority to control can include "active involvement in business affairs and the making of corporate policy, including assuming the duties of a corporate officer." *Amy Travel*, 875 F.2d at 573. When the defendant is the chief executive and sole shareholder of a closely held corporation, the burden of exculpating himself from the deceptive acts carried out under the name of the corporation is heavy. *Standard Ed-*

*ucators, Inc. v. FTC*, 475 F.2d 401, 403 (D.C.Cir.), *cert. denied*, 414 U.S. 828, 94 S.Ct. 54, 38 L.Ed.2d 63 (1973).

■ An individual defendant may be held liable for restitution for corporate practices if it can be demonstrated that the individual "had or should have had knowledge or, awareness of the misrepresentations." *Amy Travel*, 875 F.2d at 574. This knowledge element, however, need not rise to the level of subjective intent to defraud consumers. *Id.* Instead, it need only be demonstrated that the individual had "actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth" in order for an individual to be liable for restitution under the FTC Act. *Id.* (citation omitted). The degree of a defendant's participation in business affairs is probative of that defendant's knowledge. *Id.*; *FTC v. Sharp*, 782 F.Supp. 1445, 1450 (D.Nev.1991). In addition, defendants who know of government inquiries or investigations into their own or their associates' behavior may be charged with knowledge for purposes of imposing monetary liability under the FTC Act. *FTC v. NCH, Inc.*, 1995–2 Trade Cas. (CCH) ¶ 71,114, at 75,352 (D.Nev. Aug.31, 1995), *aff'd without op.*, 106 F.3d 407, 1997 WL 22246 (9th Cir.1997).

■ Considering the material facts and the governing standards, the Court finds that Tankersley and the Corporate Defendants engaged in deceptive practices in violation of section 5 of the FTC Act. The evidence demonstrates that the Defendants operated a coordinated advertising, telemarketing, and mailing operation to defraud job-seeking consumers nationwide. The evidence demonstrates that the Defendants made false representations to consumers in the following regards. First,

the Defendants mislead consumers into believing that their employment program was affiliated with or endorsed by the Postal Service. The Defendants artfully crafted their advertisements and telephone sales scripts and rebuttal sheets to convey the impression of government affiliation or endorsement. The Defendants' sales scripts and rebuttal sheets were equally misleading.

Second, the Defendants mislead consumers to believe that permanent positions with the Postal Service were available in the geographic areas where the Defendants placed their advertisements and that the Postal Service was offering examinations for those positions. The script and rebuttal sheets implied that postal jobs were locally available and that job seekers could register for the exam.

Third, the Defendants mislead consumers to believe that consumers who purchased and reviewed the Defendants' materials were likely to receive scores of 95 or higher on Test 470. The materials sent by the Defendants confirmed the oral representation that consumers received from the Defendants' telemarketers. Considering the facts that Test 470 was not being offered in most areas, that test preparation would enable only moderate improvement but not the overwhelming improvement necessary for consumers to score 95 or higher on Test 470 as the Defendants promised, that only the smallest percentage of applicants taking Test 470 actually scored 95 or higher on the examination, and that the Defendants never studied the population of consumers who purchased their materials, the score guarantee was deceptive.

Fourth, the Defendants falsely represented that consumers were likely to receive permanent positions with the Postal Service within a short period of time, and some consumers specifically recalled that they were assured of a job. However, consumers who purchased the Defendants' materials were unlikely to receive permanent positions with the Postal Service within a short period of time.

Fifth, the Defendants falsely represented that the Defendants' program came with a full, unconditional money-back guarantee and that the Defendants paid full refunds to consumers who did not score 95–100% on Test 470 and receive a job with the Postal Service.

The evidence demonstrates that the Defendants widely disseminated misrepresentations upon which reasonable persons would, and in fact did, rely to their detriment. The Defendants' claims were material to consumers, and consumers, acting reasonably under the circumstances of this case, would likely be mislead.

 Furthermore, the evidence demonstrates that Tankersley directed and was actively involved in the fraudulent business scheme. The evidence establishes that Tankersley had the authority to control, and did in fact control, the Corporate Defendants, Career Advancement (Indiana), and their practices and acts. The evidence demonstrates that Tankersley had actual knowledge of the Defendants' misrepresentations. His knowledge of the fraudulent practices is demonstrated by his explanations to his managers that the advertisements and scripts were designed to mislead consumers, the elaborate measures he undertook and the network of corporate entities and address he created to avoid law enforcement inquiry and investigation and to discourage consumers and prevent them from receiving refunds, the previous litigation and investigation regarding the Defendants' false and deceptive practices, and his instruction to employees not to sign for mail coming from a Better Business Bureau or attorneys general. Considering Tankersley's control of the Corporate Defendants and Career Ad-

vancement (Indiana), the sharing of office space and offices, the network of interrelated companies, and the movement of funds among the companies, the evidence also demonstrates that Tankersley, the Corporate Defendants, and Career Advancement (Indiana) operated a common enterprise.

Based on the record before this Court, this Court finds that there is no genuine issue as to any material fact, and the Commission is entitled to judgment as a matter of law against the Corporate Defendants and Tankersley.

## CONCLUSION

For all the foregoing reasons, the Plaintiff's Motion for Summary Judgment is hereby GRANTED IN PART.